## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| DOLL CURTIS, | ) | |
| | ) | |
| Plaintiff, | ) | 16 C 8042 |
| | ) | |
| v. | ) | Judge John Z. Lee |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Doll Curtis has sued the City of Chicago ("the City") for race discrimination (Count I) and retaliation (Count II) in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as well as failure to accommodate (Count III) and retaliation (Count IV) in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* Curtis also alleges that the City's actions violated the Illinois Human Rights Act ("IHRA"), 775 Ill. Comp. Stat. 5/1 *et seq.*, (Count V). The City moves for summary judgment. For the reasons set forth herein, the City's motion [93] is granted.

## Northern District of Illinois Local Rule 56.1

As an initial matter, the City points out various issues with Curtis's Local Rule 56.1(b)(3)(C) Statement of Additional Facts. The City contends that Curtis's Statement of Additional Facts contains (1) citations to exhibits (specifically, "B," "C," "E," and "H") that do not correspond to exhibits within the record, (2) citations to excerpts of Curtis's deposition that have not been provided, (3) citations to the entire record of a previous lawsuit without specifying to which parts of the record she refers

or entering those documents into the record of this case, and (4) citations to an entire deposition without specifying the portions to which she cites. *See* Def.'s Reply Supp. Mot. Summ. J. at 3–4, ECF No. 127. Additionally, the City argues, Curtis's Statement of Additional Facts contains argumentative and conclusory assertions. *Id.*

Northern District of Illinois Local Rule 56.1 requires a party opposing summary judgment to file a statement of "additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon." N.D. Ill. LR 56.1(b)(3)(C). If the nonmoving party fails to file such a statement or otherwise controvert the moving party's statement of facts, "[a]ll material facts set forth in the statement required of the moving party will be deemed admitted." *Id.*

The purpose of statements submitted under Local Rule 56.1 is "to identify for the Court the evidence supporting a party's factual assertions in an organized manner." *Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000). Accordingly, these statements must contain *specific* references to the record. "'[S]pecific reference' means including proper Bluebook citations to exact pieces of the record that support the factual contention contained in the paragraph. In other words, citations must include page (or paragraph) numbers, as opposed to simply citing an entire deposition, affidavit, or other exhibit document." *Id.* at 583. The Court is entitled to require strict compliance with this rule, as "district courts are not obliged in our adversary system to scour the record looking for factual disputes." *Id.* (quoting

*Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994)). "Factual allegations not properly supported by citation to the record are nullities." *Id.*

The Court agrees that Curtis's citations to the record leave much to be desired. Curtis filed *two* documents entitled "Plaintiff's 56.1(b)(3) Statement of Additional Facts" ("Pl.'s SOAF"). *See* ECF Nos. 118, 119. Attached to the first document are Exhibits 1–10 from Curtis's deposition.[1] ECF No. 118. Attached to the second document is what appears to be a complete refiling of the exhibits included with the City's Statement of Facts, with several additional documents tacked on. *Compare* Def.'s Exs., ECF Nos. 94-1–94-3, *with* Pl.'s Exs., ECF Nos. 119-1–119-5. In Curtis's filing, as in the City's, Exhibit B is the sworn declaration of Ramona Hallihan, the City's Deputy Director of Finance and Administration, and Exhibit C is the sworn declaration of Brian Devereaux, Curtis's former supervisor. But separately, Curtis filed the depositions of Charles Brown (a former colleague and supervisor) and Katina Buzanis (another former colleague), to which she appears to refer, respectively, as Exhibits B and C. *See* Pl.'s Add'l Exs., ECF Nos. 123–123-3; Pl.'s SOAF ¶ 1. Despite this confusion, the Court is able to discern when Curtis is citing to the Brown and Buzanis depositions as opposed to the Hallihan and Devereaux declarations, and apparently the City was similarly capable. *See* Def.'s LR 56.1(b)(3)(B) Resp. Pl.'s SOAF ¶ 1, ECF No. 126. Accordingly, the Court declines to strike Curtis's references to Exhibits B and C.

---

[1] Inexplicably, Exhibits 16–21 from the deposition are filed separately at ECF No. 124; Exhibits 11–15 do not appear to have been filed.

Exhibits E and H, however, are a different story. Curtis cites to an "Exhibit E," described as "Plaintiff's Answers to Interrogatories." Pl.'s SOAF ¶ 23. But the only "Exhibit E" in the record is Volume II of Curtis's deposition. *See* Pl.'s Ex. E, Curtis Dep. Vol. II, ECF No. 119-2. Accordingly, Curtis's references to interrogatory responses that are not contained in the record are stricken. Pl.'s SOAF ¶ 23.

Similarly, although Curtis cites to an "Exhibit H," there is no exhibit labeled as such in the record. Furthermore, "Exhibit H" appears in some places to refer to part of a deposition; however, the documents appended to Curtis's exhibits after "Exhibit G" contain no such deposition. *See* Pl.'s Exs., ECF Nos. 119-3–119-5. Accordingly, Curtis's references to the deposition in "Exhibit H" are stricken. Pl.'s SOAF ¶¶ 27, 29. That said, Curtis also refers to an email written in December 2015 as "Exhibit H." Pl.'s SOAF ¶ 30. The six pages appended after "Exhibit G" do contain such an email. Accordingly, the Court does not strike this fact and considers the cited email and responses to be "Plaintiff's Exhibit H." *See* Pl.'s Ex. H, December 2015 Emails, ECF No. 119-5.

Next, the City is correct that Curtis cites to pages of her deposition that are not provided in the record. *See* Pl.'s SOAF ¶¶ 3, 8, 12 (citing Curtis Dep. at 80), 13, 16, 17 (citing Curtis Dep. at 166–67), 18–19, 20 (citing Curtis Dep. at 126), 22 (citing Curtis Dep. at 166–67), 30. Because Plaintiff has failed to support these facts with citations to the record, they are stricken.

Furthermore, Curtis improperly cites to the entire record of her previous lawsuit against the City, *Curtis v. City of Chicago*, No. 12 C 7557 (N.D. Ill. filed Sep.

4

21, 2012). *See* Pl.'s SOAF ¶ 5. This citation does not point the Court to any particular part of that record; nor has Curtis submitted any documents from that record into evidence in this case. Accordingly, the cited facts are stricken. *See id.* Additionally, Curtis cites to the City's Answer in No. 12 C 7557 to support the propositions that (1) she was reinstated to her position after that lawsuit and received backpay, and (2) the City knew she had certain disabilities for which she needed accommodations. *Id.* ¶¶ 3, 28. The Answer does not support these facts, so Curtis may not rely on it. *See id.*; Def.'s Am. Answer ¶¶ 9, 15, No. 12 C 7557, ECF No. 43.

Curtis also improperly cites to the entire deposition of her former colleague Iris Fojt without specifying a page number. *See* Pl.'s SOAF ¶ 32. The City has done the same thing, *see* Def.'s LR 56.1(a) Stmt. Facts ("Def.'s SOF") ¶ 51, ECF No. 94. Accordingly, the citations of both sides to that deposition are stricken.

Finally, the Court rejects the City's invitation to strike a number of other statements in Curtis's Statement of Additional Facts as being conclusory or argumentative. The Court reviews each statement of fact submitted by the parties to ensure that it is properly supported by admissible evidence and will rely only on factual statements based on admissible evidence.

### Factual Background[2]

Curtis, who is African-American, first began working for the City in 2000 as an "Auditor I" in the Tax Division of the Department of Finance. Def.'s SOF ¶¶ 1, 30. She was promoted to "Auditor II" in December 2002, and then to "Auditor III" in

---

[2] The following facts are undisputed except where otherwise noted.

January 2008. *Id.* ¶¶ 31–32. Curtis worked as an Auditor III in the Tax Division until December 2017. *Id.* ¶ 1. During that time, she says, she suffered from lower pelvic disorder, tendinitis, bipolar disorder, depression, respiratory and musculoskeletal problems, asthma, left knee pain, and low back pain. *Id.* ¶¶ 57–58. She also made several complaints of discrimination to the Equal Employment Opportunity Commission ("EEOC") and settled a previous lawsuit against the City claiming discrimination. *Id.* ¶¶ 45–46, 48.

## I. Structure of the Tax Division & Applicable Policies

The role of auditors in the Tax Division is to "determine if [a] taxpayer/collector is in full compliance with the City's tax ordinances and ensure that all monies due and owing the City have been remitted in accordance with the City's tax ordinances." *Id.* ¶ 7. Auditor III is a senior auditing position that reports to an Audit Supervisor. *Id.* ¶¶ 7, 32. As an Auditor III, Curtis was responsible for reviewing taxpayers' financial records, which sometimes involved traveling to taxpayer sites to retrieve and review the files.[3] *Id.* ¶ 32.; *see* Def.'s Ex. A, Curtis Dep. Vol. I at 33:17–39:23, ECF No. 94-2.

Auditors are assigned to different sections of the Tax Division and given tax-enforcement assignments by their supervisors. Def.'s SOF ¶ 18. Their tax-enforcement caseloads are determined at the beginning of each calendar year and consist of new case assignments and cases that were assigned the previous year but

---

[3] Curtis disputes whether traveling and transport was an essential component of the job, and points out that she sometimes spoke to taxpayers over the phone or email. Pl.'s LR 56.1(b)(3)(B) Resp. Def.'s SOF ¶ 32, ECF No. 117.

not completed. *Id.* ¶ 20. Audit Supervisors analyze each auditor's caseload to determine the number and type of cases that should be completed each year (a "target assessment"). *Id.* ¶¶ 20, 22. Target assessments vary among auditors and factor in the tax type and complexity of each case. *Id.* ¶ 22.[4] Audit Supervisors determine the amount of time each case should take. *Id.* ¶ 20.

The Tax Division uses the "Time Metric System" to measure the work performed by each auditor. The System is a set of guidelines used to measure how much time auditors spend on cases, which is then compared to the target assessments set by the Audit Supervisor. Def.'s SOF ¶¶ 20–21. At the beginning of each year, auditors are given memoranda explaining their target goals for the upcoming six-month review period. *Id.* ¶ 24. Written performance evaluations then are conducted every six months using the "Performance Management System," which measures auditors' compliance with productivity and quality standards. *Id.* ¶ 25. Performance ratings fall on a five-point scale: 1.0 to 1.9 (unsatisfactory), 2.0 to 2.7 (requires improvement), 2.8 to 3.4 (good), and 3.5 to 4.0 (very good). *Id.* Failure to meet the time metric goals may result in an auditor being placed on a Performance Improvement Plan ("PIP"). *Id.* ¶ 27. A PIP is "designed to monitor the performance of the auditor by setting clear and detailed expectations for their performance and provid[ing] them a date by which they are able to meet those expectations." *Id.*

---

[4]     Curtis disputes the City's SOF ¶ 22 and contends that "[s]upervisors are given complete discretion on which audits to give to each auditor." Pl.'s LR 56.1(b)(3)(B) Resp. Def.'s SOF ¶ 22. Whether or not that is the case, Curtis offers no evidence to contradict the assertion that target assessments account for various factors such as tax type and complexity. *See id.*

The Tax Division is governed by a collective bargaining agreement. *Id.* ¶ 14. This agreement establishes a progressive discipline policy under which, at the employer's discretion, disciplinary action may consist of "an oral warning, written reprimand, suspension (up to 30 days) or discharge, depending . . . upon various factors, such as, but not limited to, the severity of the offense or the employee's prior record." *Id.* ¶¶ 16–17. Before disciplinary action is taken, it must be reviewed and approved by upper management and labor relations officials. *Id.* ¶ 26.

## II.    The City's Reasonable Accommodations Policy

The City's Disability Officer is responsible for reviewing and granting all requests for accommodations by City employees. *Id.* ¶ 59. Jennifer Smith was the Disability Officer until June 2017, when Kathryn Perry-Hopkins succeeded her. *Id.* ¶¶ 58–59, 62.

As part of the accommodation process, a qualifying employee could agree to be reassigned, and he or she would be referred to the Reassignment Team. *Id.* The Reassignment Team then searches for a vacant City position (of lesser or equal rank to the employee's current position) for a period of 90 days. *Id.* ¶¶ 59, 61. The vacant position must be one for which the employee is qualified and able to perform the essential functions, taking into account medical restrictions. *Id.* ¶ 61. The employee does not have to interview for the position, and the new department must accept the reassigned employee. *Id.* The Reassignment Team may extend the 90-day period as needed. *Id.*

### III. Chronology of Events

In March 2014, Curtis settled her prior lawsuit against the City. *Id.* ¶ 48. Shortly thereafter, she was assigned to a new Audit Supervisor, Brian Devereaux, who recently had been promoted to the position. Pl.'s SOAF ¶¶ 4, 6. Curtis believes that she should have been promoted to the Audit Supervisor position instead of Devereaux. *Id.* ¶¶ 4–5; *see also* Def.'s SOF ¶ 52.

In August 2014, Devereaux reviewed Curtis's performance for the first half of the year and noted that she had received a 2.5 time metric rating and a 2.8 overall rating. Def.'s SOF ¶ 38; *see* Def.'s Ex. C, Devereaux Decl., Ex. 2, 2014 Performance Records at 25, ECF No. 94-3.[5] Because of Curtis's low time metric rating, Devereaux placed her on a PIP. Def.'s SOF ¶ 38; 2014 Performance Records at 25.

Curtis filed her first EEOC charge relating to this case on January 5, 2015. Def.'s SOF ¶ 45. In the charge, she alleged that she had been discriminated against based on her race, disability, and in retaliation for having previously engaged in protected complaints about discrimination. *Id.*

On February 27, 2015, Curtis received her performance evaluation for the second half of 2014. 2014 Performance Records at 27. For the period from July to December 2014, Curtis received a 2.7 time metric rating and a 2.3 overall rating. Def.'s SOF ¶ 38; 2014 Performance Records at 27. Devereaux noted that the "hours on [Curtis's] submitted time reports [did] not always match the time allocated on

---

[5] The City's Exhibits C–G are all contained within ECF No. 94-3. For clarity, when citing to these exhibits, the Court references the ECF page number at the top of the PDF.

[her] audit programs," and that her case hours were approximately 54% over her target assessment. Def.'s SOF ¶ 38; 2014 Performance Records at 27. Because Curtis had not met her target assessments and had received a low time metric score, she was again placed on a PIP. Def.'s SOF ¶ 38; 2014 Performance Records at 28.

A month later, in March 2015, Devereaux suspended Curtis for ten days. Def.'s SOF ¶ 42; *see* Def.'s Ex. C, Devereaux Decl., Ex. 6, Pl.'s Disciplinary Records at 62–63, ECF No. 94-3. He explained that Curtis had failed to meet the performance standards of her position from July 1 to December 31, 2014. Pl.'s Disciplinary Records at 63. In particular, although Curtis was expected to complete ten tax assessments during that period, she completed only six—despite the fact that she had been on a PIP. *Id.* Curtis's disciplinary notice explained that she had previously received discipline, including written and oral reprimands and suspensions. *Id.* at 62.

On August 4, 2015, Curtis filed a second EEOC charge related to this lawsuit. Def.'s SOF ¶ 46. She again claimed she had experienced discrimination due to her race and in retaliation for filing previous complaints. *Id.* Curtis did not notify anyone at the City, including Devereaux, that she had filed either the January or August charges. *Id.* ¶ 47.

On August 31, 2015, Curtis received her performance review for the first half of 2015. Def.'s SOF ¶ 39; *see* Def.'s Ex. C, Devereaux Decl., Ex. 3, 2015 Performance Records at 37, ECF No. 94-3. For the period from January to June 2015, Curtis received a time metric rating of 2.3 and an overall rating of 2.7. 2015 Performance Records at 37. She was again placed on a PIP. *Id.*

In December 2015, Curtis wrote to Disability Officer Smith, seeking to modify previous accommodations she had been granted. *See* Def.'s LR 56.1(b)(3)(B) Resp. Pl.'s SOAF ¶ 30; Pl.'s Ex. H, December 2015 Emails. Curtis explained: "I'm having difficulty with the accommodation that has been granted i.e. making multiple trips to and from my vehicle to carry in the city owned equipment and etc." Pl.'s Ex. H, December 2015 Emails. Smith responded that "the best course of action . . . at this point is to request another accommodation since you believe that the previously granted accommodation is not efficient." *Id.*

Accordingly, on February 10, 2016, Curtis submitted to Smith a formal accommodation request. Def.'s SOF ¶ 58. She listed her impairment as "respiratory and musculoskeletal" and requested "reassignment to a non-field audit position i.e. an office position." *Id.*; *see* Def.'s Ex. E, Curtis Dep. Vol. II, Ex. 30, Request for Reasonable Accommodation at 2, ECF No. 94-3. She explained that making multiple trips to and from her car to carry work-related equipment and documents "create[d] a respiratory issue" for her. Request for Reasonable Accommodation at 2. Curtis did not inform Devereaux about this accommodation request. Def.'s SOF ¶ 65.[6]

Smith responded the same day, asking Curtis to confirm whether she wanted to participate in the reassignment process, which would involve referring her to the Reassignment Team. *Id.* ¶ 59; *see* Def.'s Ex. G, Perry-Hopkins Decl., Ex. B, Accommodations Correspondence at 154, ECF No. 94-3. Curtis agreed to participate

---

[6]     Curtis contends that she had previously made verbal or other informal requests for accommodation. This contention is not supported by proper citation to the record and thus is disregarded. *See* Pl.'s LR 56.1(b)(3)(B) Resp. Def.'s SOF ¶¶ 58–59, 65; Pl.'s SOF ¶ 30.

in reassignment. Def.'s SOF ¶ 59. And, in response, Smith sent Curtis a Determination Notice finding that Curtis could not perform the essential functions of her position as an Auditor III and granting her request for reassignment. *Id.* ¶ 60; *see* Accommodations Correspondence at 152–53.

Curtis now disputes that she was unable to perform the essential functions of her job as an Auditor III and states that other accommodations could have been made to obviate the need for her to carry files to and from taxpayer sites. Pl.'s LR 56.1(b)(3)(B) Resp. Def.'s SOF ¶ 60.

Curtis was suspended for 15 days at the end of February 2016. Def.'s SOF ¶ 42; *see* Pl.'s Disciplinary Records at 68–71. In a memo explaining the suspension, Devereaux explained that Curtis had failed to meet performance standards from July to December of 2015. Pl.'s Disciplinary Records at 69. In particular, Curtis was supposed to complete ten tax assessments during that time, but completed only three. *Id.* This was despite having been placed on a PIP from September to the end of November. *Id.* Devereaux attributed Curtis's untimeliness to her "inefficiency in conducting audits and her allocation of work hours within her audit programs." *Id.*

Curtis received her performance review for the second half of 2015 in March 2016. Def.'s SOF ¶ 39; 2015 Performance Records at 42. In that review, Devereaux noted that Curtis's time metric rating for the period was 1.7 and her overall rating was 2.0. 2015 Performance Records at 42. And Devereaux placed Curtis on a PIP yet again. *Id.*

Curtis filed this lawsuit on August 11, 2016. Compl., ECF No. 1. On August 15, 2016, Curtis received a performance review for the first half of the year. Def.'s SOF ¶ 40; *see* Def.'s Ex. C, Devereaux Decl., Ex. 4, 2016 Performance Records at 50, ECF No. 94-3. Her time metric rating was 1.3, and her overall rating was 2.2. 2016 Performance Records at 50. Devereaux again placed Curtis on a PIP. *Id.*

On January 23, 2017, Devereaux suspended Curtis for 29 days, citing her performance in the second half of 2016. Def.'s SOF ¶ 42; Pl.'s Disciplinary Records at 77–78. Devereaux explained that Curtis had been on a PIP for the first half of 2016, which was extended through September to account for unexpected leave that Curtis took. Pl.'s Disciplinary Records at 78. Devereaux pointed out that Curtis was expected to complete eight tax assessments during the PIP period, but she completed only four. *Id.* Furthermore, for the assessments she did complete, she had exceeded the target hours. *Id.* Devereaux wrote: "The reason you are not meeting assessment goals and target hours is because you are inefficient when conducting audits and you have been accumulating hours to audit steps that cannot be substantiated with the amount of work actually performed." *Id.*[7]

Curtis received her performance evaluation for the second half of 2016 on February 14, 2017. Def.'s SOF ¶ 40; 2016 Performance Records at 52. The evaluation reflected that her time metric rating was 2.4 and her overall rating was 2.7. Def.'s

---

[7] Shortly after this performance review, Curtis filed her amended complaint in this case. Am. Compl., ECF No. 31.

SOF ¶ 40; 2016 Performance Records at 52. Devereaux once again placed Curtis on a PIP. 2016 Performance Records at 52.

Curtis disputes the basis for each of the performance reviews and instances of discipline described above. *See* Pl.'s LR 56.1(b)(3)(B) Resp. Def.'s SOF ¶¶ 38–40, 42–44, 48. She contends that the rationales given by Devereaux were not an "honest reflection of" her work and were pretext for discrimination and retaliation. *Id.* In particular, she contends (and the City disputes) that she was not given credit for some of her work because of the subjective nature of the Time Metric System and her physical inability to carry taxpayer records back to the office to substantiate the time she spent working. *Id.* ¶ 21; Pl.'s SOAF ¶¶ 17, 22.

Curtis took a leave of absence on February 24, 2017, and never returned. Def.'s SOF ¶ 63; *see* Def.'s Ex. B, Hallihan Decl. ¶ 15, ECF No. 94-2. Although the Reassignment Team apparently had not yet found a vacant position for Curtis, it continued searching. Def.'s SOF ¶ 62. On November 21, 2017, Curtis was reassigned to an Accountant IV position in the Department of Aviation. *Id.* ¶ 64. Curtis began working in the Department of Aviation in December 2017. *Id.*

## IV. Alleged Denials of Promotion

Curtis says she was illegally denied the position of Audit Supervisor in the Department of Finance when Devereaux was promoted to that role in March 2014. *Id.* ¶ 52. Curtis further asserts that she was denied training—consisting of "peer auditing experience," amusement tax training, and Excel training—that would have made her a more qualified candidate for the position. *Id.* ¶¶ 54–55. It is undisputed,

however, that none of this training was required for promotion, and Curtis did receive amusement tax training when she began as an auditor in the Tax Division. *Id.* ¶ 54. Furthermore, Curtis acknowledges that she did not apply for the position, although the parties dispute whether an application was necessary. Pl.'s LR 56.1(b)(3)(B) Resp. Def.'s SOF ¶ 54; Def.'s LR 56.1(b)(3)(B) Resp. Pl.'s SOAF ¶ 4.

Curtis further claims that she was not promoted to the positions of Compliance Officer in the Department of Procurement or Finance Officer in the Department of Health because of her history of suspensions (which she contends were unjustified). Def.'s SOF ¶ 52; *see* Curtis Dep. Vol. II at 225:4–228:17.

## V.    Alleged Comparators

Devereaux is white. Def.'s SOF ¶ 11. Before he was promoted to the role of Audit Supervisor, his supervisor allowed him to review the work of his peers (otherwise referred to as "peer auditing experience") once he had completed all of his own work satisfactorily. *Id.* ¶ 56. The parties dispute whether Curtis was denied similar experience and whether she was qualified or considered for the role of Audit Supervisor. *See id.* ¶¶ 52, 54–56; Pl.'s SOAF ¶¶ 4–5.

Curtis alleges that non-African-American auditors were not disciplined when they failed to meet performance standards or failed to comply with their PIPs. Def.'s SOF ¶ 49. She testified that such auditors included Iris Fojt, Crystal Pekic, Mike Keilar, Mary Sakelaris, Orlando Corral, Emily Hunter, and Patty Villapando. *Id.* Of these auditors, only Corral and Fojt were supervised by Devereaux. *Id.* ¶ 50.

Fojt, who is not African-American,[8] was given an oral reprimand by Devereaux in May 2017 for poor performance. *Id.* ¶ 51; Def.'s Ex. C, Devereaux Decl., Ex. 7, Fojt Records at 85, ECF No. 94-3. Specifically, Fojt had been placed on a PIP in July 2016, which was later extended to May 2017. Fojt Records at 87–89. In the memorandum explaining why Fojt was receiving an oral reprimand, Devereaux explained: "For the period of July 1, 2016 through December 31, 2016, you were expected to complete ten (10) audit assessments. For the evaluation period, you completed or were given consideration for only six (6) audit assessments." *Id.* at 86. Fojt had previously received an oral and a written reprimand in 2011. *Id.* at 85.

In contrast to Curtis, Corral was an Auditor II. Curtis Dep. Vol. II at 214:16-17. Curtis testified that she heard through other auditors that he was not disciplined for failing to meet his PIP. Pl.'s SOAF ¶ 21; *see* Curtis Dep. Vol. I at 116:22–117:4.

### Legal Standard

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, a court must "view the facts in the light most favorable to the nonmoving party." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2017 (2014). A district court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013). The Court

---

[8]     Although the Court previously struck Curtis's statement of fact describing Fojt's race and the City's similar statement of fact describing Fojt's race, the parties do not dispute that she is not African-American. Def.'s LR 56.1(b)(3)(B) Resp. Pl.'s SOAF ¶ 12.

must not make credibility determinations or weigh conflicting evidence. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010). "The judge must ask whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The existence of a mere scintilla of evidence supporting a plaintiff's position is insufficient; there must be evidence on which a jury could reasonably find for the plaintiff." *Insolia v. Phillip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).

## Analysis

The City has moved for summary judgment as to each of Curtis's claims. First, the City argues that Curtis's IHRA claims (Count V) are preempted by her Title VII and ADA claims. As for Curtis's race-discrimination claims (Counts I and V), the City contends that placement on a PIP is not a materially adverse action and there is no evidence that racial animus motivated the denial of promotions or discipline that Curtis experienced. As for her retaliation claims (Counts II, IV, and V), the City argues that there is no evidence that decisionmakers were aware of Curtis's protected activity under either Title VII or the ADA, and that even if they were, the adverse actions she experienced were justified because Curtis was not meeting the City's legitimate performance expectations. For her disability claims (Counts III and V), the City argues that Curtis was accommodated through reassignment to a new position as an Account IV. Finally, the City contends, Curtis's ADA claims (Counts III and IV) should be dismissed for failure to exhaust administrative remedies.

## I.  IHRA Preemption

The City argues that, to the extent Curtis's IHRA claims are "predicated upon the same facts as her Title VII and ADA claims," the IHRA claims are "preempted by law." Def.'s Mem. Supp. Mot. Summ. J. at 27, ECF No. 99.  In support of this position, the City cites *Segura v. Strive Group, LLC*, No. 11 C 5334, 2012 WL 711442, at *3 (N.D. Ill. Mar. 5, 2012), and *Geise v. Phoenix Company of Chicago, Inc.*, 639 N.E.2d 1273, 1277–78 (Ill. 1994)).  But neither case holds that Title VII or the ADA preempts factually similar IHRA claims.  Rather, both cases discuss preemption of state common-law causes of action by the IHRA.  *Segura*, 2012 WL 711442, at *3 (citing *Geise*, 639 N.E.2d at 1277).  The fact that the IHRA contains a preemption clause does not mean that IHRA claims are *themselves* preempted by federal law.

Courts addressing IHRA claims based on race discrimination and retaliation use the framework that applies to Title VII claims.  *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016).  The same is true with disability discrimination and retaliation claims brought under both the IHRA and the ADA. *Keen v. Teva Sales & Mktg., Inc.*, 303 F. Supp. 3d 690, 715 (N.D. Ill. 2018). Accordingly, rather than considering Curtis's IHRA claims to be preempted, the Court will consider them together with her Title VII and ADA claims.

## II.  Disability Discrimination & Failure to Accommodate (Counts III & V)

Curtis contends that she was discriminated against based on her disabilities comprised of lower pelvic dysfunction, shoulder tendinitis, and knee tendinitis,

because the City failed to accommodate her. The City, in response, points out that Curtis requested and agreed to be reassigned as an accommodation.

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Disability discrimination includes both disparate treatment on the basis of disability and failure to accommodate a disability. *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019). To prove disparate treatment, a plaintiff must show that: "(1) [s]he is disabled; (2) [s]he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by [her] disability." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) (citation omitted). By contrast, a claim for failure to accommodate requires proof that "(1) plaintiff was a qualified individual with a disability; (2) defendant was aware of [her] disability; and (3) defendant failed to accommodate [her] disability reasonably." *Scheidler*, 914 F.3d at 541.

As an initial matter, Curtis does not argue that any of her discipline or other adverse experiences were caused by her disability, as opposed to her race or retaliation. Accordingly, Curtis advances only a failure-to-accommodate claim. As for that claim, the City correctly points out that Curtis's February 2016 request for accommodation is the only such request supported by the record. *See* Def.'s SOF ¶¶ 58–60. Although Curtis argues that she requested accommodations earlier in

2014 and 2015, *see* Pl.'s SOAF ¶¶ 28, 30; Pl.'s LR 56.1(b)(3)(B) Resp. Def.'s SOF ¶¶ 58–59, the record does not support that contention. *See supra* n.6.

The City granted Curtis's February 2016 request for accommodations and reassigned her. Still, Curtis argues that the City's accommodation was inadequate. First, she contends that reassignment was unnecessary because she could have been accommodated within her Auditor III position. But her own accommodation request belies this assertion. On the request form, Curtis requested "reassignment to a non-field audit position i.e. an office position." Request for Reasonable Accommodation at 2. Smith, the City's Disability Officer, wrote back to confirm that Curtis indeed wanted to move forward with the reassignment process, and Curtis confirmed that she did. Although Curtis had previously written to Smith to inform her of the difficulty she experienced in carrying equipment and files, Curtis did not request any accommodation other than reassignment, which was granted.

A reasonable accommodation is a "[m]odification[ ] or adjustment[ ] to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability . . . to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). "Once an employee requests a reasonable accommodation, the employer must meet the employee half way and engage in a 'flexible, interactive process' to identify the necessary accommodations." *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir. 2014) (quoting *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1038 (7th Cir. 2013)). "Where the employee does not provide sufficient information to the

employer to determine the necessary accommodations, the employer cannot be held liable for failing to accommodate the disabled employee." *Id.* (citing *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)).

An employee cannot provide "sufficient information" to determine that a specific accommodation is necessary without ever asking for that accommodation. *See id.* (concluding that the plaintiff had not made reasonable efforts to help the employer determine what accommodations were necessary where she made only a "tentative request" and did not "press the issue"). Here, Curtis requested a specific accommodation—reassignment—and Smith reasonably engaged in the interactive process by confirming that Curtis was interested in pursuing the reassignment process provided by the City. Smith's failure to divine a need for other, unrequested accommodations does not constitute disability discrimination. Accordingly, whether or not Curtis could have performed the essential functions of her Auditor III job with different accommodations is immaterial to her accommodation claim.

Curtis points out, however, that even though her reassignment request was granted the same day, she was not actually reassigned for over a year and a half. Unreasonable delay in providing an accommodation may evidence discrimination; however, this is not the case if the employer acted reasonably and in good faith. *Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000). In *Jay*, for example, the employer was not able to reassign the employee for 20 months, until a position became available. *Id.* During that period, the employer considered the employee for reassignment on a weekly basis and kept him on medical leave. *Id.*

The circumstances here are similar—although the City was required only to search for a vacant position for 90 days, it continued to search and communicate with Curtis about reassignment long after that time had elapsed. Furthermore, Curtis was on leave or suspended for a substantial amount of time during the delay. *See* Def.'s SOF ¶¶ 42, 63; Pl.'s Disciplinary Records at 78; Hallihan Decl. ¶ 15. Curtis has not pointed to any evidence that she was passed over for vacant positions during the delay, that the City stopped trying to accommodate her, or that she sought and was denied any alternative accommodations during that time.[9] Accordingly, because the City reasonably engaged in the interactive process in good faith and provided Curtis with the accommodation she requested, it is entitled to summary judgment on Curtis's claims of disability discrimination and failure to accommodate.

## III. Race Discrimination Claims (Counts I & V)

Curtis contends that, because of her race, she was subjected to denial of promotions, placement on multiple PIPs, and suspensions. The City contends that a PIP is not a materially adverse action for purposes of a discrimination claim, and that Curtis has pointed to no evidence that any adverse action was caused by her race as opposed to her poor performance.

To prevail on a claim of race discrimination under Title VII, the evidence must be sufficient to permit a reasonable factfinder to conclude that "the plaintiff's

---

[9]     Curtis asserts that she applied to the position to which she was ultimately reassigned "in 2015, when it was initially advertised and available, but did not receive her requested accommodation until December 2016." Pl.'s Resp. Opp. Mot. Summ. J. at 19, ECF No. 116. This assertion is both inaccurate (as she was reassigned in December 2017, not 2016) and unsupported by citation to any record evidence.

race . . . caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). One of the ways that a plaintiff can meet this burden is by using the framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the *McDonnell Douglas* framework, a plaintiff must present evidence that "(1) she is a member of a protected class, (2) she was meeting the [employer's] legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably." *Fields v Bd. of Educ. of City of Chi.*, 928 F.3d 622, 625 (7th Cir. 2019). If the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the employer to offer some "legitimate, nondiscriminatory reason" for the employment decision. *Oliver v. Joint Logistics Managers, Inc.*, 893 F.3d 408, 412 (7th Cir. 2018). If the employer is able to do so, the plaintiff must then show that the employer's stated reason is pretextual. *Id.*

Separate and apart from this framework (or, perhaps, in the process of engaging in it), a plaintiff can simply point to evidence in the record from which a reasonable jury could find prohibited discrimination. *Ortiz*, 834 F.3d at 765.

### A.    Placement on PIPs

As an initial matter, the Court agrees that placement on a PIP is not actionable for purposes of a discrimination claim. "[A] materially adverse employment action is one which visits upon a plaintiff a significant change in employment status," such as those involving "the employee's current wealth, . . . career prospects, or changes to

work conditions that include humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alteration in the workplace." *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) (quotation marks omitted). Although Curtis argues that she saw a "material change in her job duties as a result of being placed on a PIP," Pl.'s Resp. Opp. Mot. Summ. J. at 8, she does not provide any evidence of it, nor does she explain what the changes were. Moreover, the Seventh Circuit has held that merely being placed on a PIP is not materially adverse for purposes of a discrimination claim. *See Boss*, 816 F.3d at 918. Still, as the City acknowledges, placement on a PIP may be evidence of discrimination.

## B. Suspensions

As for the discipline Curtis experienced, the City contends that there is no evidence that the discipline was the result of discrimination. Specifically, the City argues that Curtis cannot show that she was meeting its legitimate expectations, that any non-African-American comparators were treated favorably, or that its reasons for disciplining Curtis were pretextual.

Curtis's response boils down to the following theory: the City, and specifically, Devereaux, applied the Time Metric System in a subjective way, making it look like she was working less efficiently than other auditors, who were given easier assignments or more time in which to complete them. Accordingly, Curtis contends, the City's expectations of her were illegitimate, and other non-African-American employees were treated more favorably under the Time Metric System. Furthermore, she contends, there is evidence that the City's reasons for disciplining her were

pretextual because other non-African-American employees were not disciplined when they failed to meet their target assessments. Curtis attempts to prove this theory by utilizing the *McDonnell Douglas* framework, so the Court will proceed accordingly.

And, in that vein, Curtis is unable to make out a *prima facie* case of discrimination or show that the City's reasons for disciplining her were pretextual. First, it is clear that she was not meeting the City's legitimate expectations. Time and again, Curtis failed to meet the time objectives set for her assignments and received ratings in the "requires improvement" or "unsatisfactory" ranges. These performance ratings were adequate bases for the discipline she received, which was progressive in nature.

Curtis argues that the Time Metric System is subjective and allows for manipulation. But although an employer's expectations must be "objectively reasonable," *Dale v. Chi. Tribune Co.*, 797 F.2d 458, 463 (7th Cir. 1986), courts do not "sit as 'super-personnel' to question the wisdom or business judgment of employers," *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008). There is nothing inherently discriminatory about business expectations that involve an element of subjectivity or that may be flawed or pliable in some respects—of course, so long as they are not pretexts for race discrimination.

Curtis, for her part, argues that they were, claiming that she was frequently assigned more complex cases than others and was not given adequate time or credit for those assignments. But Curtis's theory is not supported by any evidence other than her own speculation and general testimony about the subjective nature of the

Time Metric System.  *See* Pl.'s SOAF ¶¶ 9–11, 16–19, 22.  For instance, she provides no metrics as to what other auditors did or were expected to do.  A plaintiff's subjective belief that her workload was heavier than that of other employees is not sufficient to create a genuine issue of material fact of discrimination.  *See Boss*, 816 F.3d at 917; *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 539 (7th Cir. 2007).  And general testimony about the subjective nature of the City's expectations does not raise an inference that those expectations were in fact applied in a discriminatory manner.  In short, Curtis points to no evidence that specific employees outside her racial group were treated more favorably with respect to time expectations or ensuing discipline.

In the alternative, Curtis contends that non-African-American employees—specifically, Corral and Fojt—were not disciplined when they performed poorly, while she was.  But in order to provide a useful comparison, Corral and Fojt must be "similarly-situated employee[s] outside of [Curtis's] protected class."  *Boss*, 816 F.3d at 917.  "A similarly-situated employee is one whose performance, qualifications, and conduct are comparable in all material respects."  *Id.*

As the City points out, Corral was an Auditor II, not an Auditor III.  Although Curtis argues that this makes no difference, she provides no evidence to substantiate this.  And in fact, Curtis testified to the contrary, stating that "your job duties change depending on what level you're at."  Curtis Dep. Vol. II at 215:17-19.  Accordingly, the Court finds that Corral is not a valid comparator.

As for Fojt, Curtis argues that Fojt was "never placed on a PIP or disciplined for her unsatisfactory work performance until <u>after</u> Plaintiff filed her lawsuit listing

Fojt as a similarly-situated person who was treated better than Plaintiff." Pl.'s SOAF ¶ 21.[10] It is unclear, however, how this shows that Fojt was treated more favorably. When Fojt performed poorly—failing to improve after placement on two PIPs—she was given an oral reprimand. Although this was a lower level of discipline than what Curtis received for similar poor performance, Curtis had already received more discipline than Fojt had by that point. *Compare* Pl.'s Disciplinary Records at 62 (listing three prior reprimands and four prior suspensions) *with* Fojt Records at 85 (listing two prior reprimands and no suspensions). And the fact that Fojt was not given the reprimand until after Curtis filed suit does not support an inference of discrimination given that the timing of Fojt's reprimand was entirely consistent with the review process (as evidenced by Curtis's own disciplinary record). Fojt's reprimand for her performance in the second half of 2016 was issued in May 2017; similarly, Curtis received suspensions in early 2016 and 2017 for poor performance in the latter half of the previous years. Accordingly, to the extent Curtis is arguing that pretext is shown by a "delay" in the disciplining of Fojt, that argument fails.

## C.     Denial of Promotions

Curtis next contends that she was denied promotions to three positions based on her race—Audit Supervisor, Compliance Officer in the Department of

---

[10]     Fojt was an Auditor IV, *see* Def.'s SOF ¶ 50, but the City does not argue that an Auditor IV performs duties materially different from those performed by an Auditor III. Accordingly, construing the record in Curtis's favor, the Court presumes that they are equivalent positions for the purpose of this analysis.

Procurement, and Finance Officer in the Department of Health.[11] The City contends that there is no evidence that any of these denials was based on Curtis's race.

First, as to the Compliance Officer and Finance Officer positions, Curtis testified that she was not offered these positions because of her disciplinary history. She points to no evidence that either denial was based on her race, and, as already explained, there is no evidence that Curtis's underlying discipline was discriminatory. Accordingly, Curtis cannot point to any evidence that she was denied either of these positions due to her race.

As for the Audit Supervisor position, Curtis argues that Devereaux was selected over her in a discriminatory manner. But the City points out that Devereaux applied for the position, while Curtis did not. *See* Def.'s LR 56.1(b)(3)(B) Resp. Pl.'s SOAF ¶ 4. Curtis acknowledges that she did not apply, but suggests that she still should have been considered for the position because it was "common practice for auditors to be recommended for the position of Audit Supervisor . . . without ever applying." Pl.'s SOAF ¶¶ 4–5.

To support this assertion, Curtis cites to the deposition of Charles Brown, a former coworker and supervisor. But Brown explained only that in the past, his supervisor had recommended that he be promoted from Auditor II to Auditor IV; he

---

[11]    Curtis also suggests that the City unreasonably delayed her "promotion" to Accountant IV. *See* Pl.'s Resp. Opp. Mot. Summ. J. at 6. But the evidence shows that her transfer to Accountant IV was a reassignment, not a promotion; furthermore, she was not denied this position but actually received it. To the extent that Curtis intends to argue that a delay in effectuating an accommodation or reassignment can constitute race discrimination, she submits no authority in support of that proposition.

did not testify that he received either of those positions without applying. *See* Pl.'s Ex. B, Brown Dep. at 17:19–18:6, ECF No. 123-1. By contrast, Rommel Pitchan, Audit Manager for the Tax Division, states that an application was required for the Audit Supervisor position. Def.'s LR 56.1(b)(3)(B) Resp. Pl.'s SOAF, Ex. B, Pitchan Decl. ¶¶ 5–9, ECF No. 126-3.

Curtis cannot show that it was discrimination when she was passed over for a position to which she did not apply, particularly where another employee *did* apply and was evaluated according to the City's policies. *See Jaburek v. Foxx*, 813 F.3d 626, 631 (7th Cir. 2016) (explaining that "vague testimony" about a "request" for a promotion was not enough to show that the plaintiff actually applied for the position); *Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 728 (7th Cir. 2013) ("[T]he prima facie case for a failure to promote claim . . . requires that the plaintiff show . . . she applied for and was qualified for the position sought [and] she was rejected for that position.") (quoting *Fischer v. Avanade, Inc.*, 519 F.3d 393, 402 (7th Cir. 2008)). Moreover, Curtis has pointed to no evidence that she and Devereaux were similarly situated or that she even satisfied the qualifications for the position. And, given this, the fact that Devereaux may have been given additional training opportunities to prepare for the promotion does not save her claim.

**D. Conclusion**

In sum, Curtis has pointed to no evidence—either under the *McDonnell Douglas* framework or based upon the totality of the record—that creates a genuine

issue as to whether she experienced any materially adverse employment actions as a result of her race.[12] *See Ortiz*, 834 F.3d at 765. Accordingly, the City is entitled to summary judgment as to Curtis's race-discrimination claims.

## IV. Retaliation Claims (Counts II & V)

Finally, Curtis claims that she suffered retaliation in the form of suspensions, denial of promotions, placement on multiple PIPs, negative performance reviews, and denial of training, because of her previous lawsuit complaining about discrimination, her EEOC charges, and her requests for accommodation. The City contends that Curtis can point to no evidence of retaliatory animus and that, in any event, none of the relevant decisionmakers were aware of her complaints. Furthermore, the City argues, negative performance evaluations and placement on PIPs are not materially adverse actions.

To prove retaliation under Title VII or the ADA, a plaintiff must show that (1) she engaged in protected activity, (2) the employer took an adverse employment action against her, and (3) there was a causal connection between the two. *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 887–88 (7th Cir. 2016). Adverse actions in the retaliation context are defined more broadly than in the discrimination context; an action "must be one that a reasonable employee would find to be

---

[12] Curtis argues that there has been a "purging of Blacks from the department over the last decade," and that the racial environment in the Tax Division is hostile. *See* Pl.'s Resp. Opp. Mot. Summ. J. at 5. But she does not point to any evidence connecting this alleged hostility to the discipline she received. Nor does she assert a hostile-work-environment claim.

materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Lewis v. City of Chi.*, 496 F.3d 645, 655 (7th Cir. 2007).

Courts have concluded that an employee's placement on a PIP does not rise to this level where there is no evidence of any resulting adverse consequences. *See Bagwe*, 811 F.3d at 889. But here Curtis contends that the PIP did impact her performance evaluations and resulted in discipline. Furthermore, the Court rejects the City's argument that negative performance evaluations cannot qualify as an adverse action where they lead to further disciplinary measures, as they did here. *See Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1108–09 (7th Cir. 2012).

The City is correct, however, that Curtis has failed to point to any evidence that any of the decisionmakers, who took the alleged actions, were *aware* of any of her protected activity. The only evidence regarding this issue indicates that Devereaux—who was the person responsible for Curtis's performance reviews, discipline, placement on PIPs, and denial of certain training opportunities—was not aware of Curtis's EEOC charges, prior settlement agreement, or 2016 accommodation request. *See* Def.'s SOF ¶¶ 47, 65–66. Although Curtis contends that she had made other requests for accommodations in addition to the one in 2016, that assertion is unsupported by the record. *See supra* n.6. Similarly, although Curtis contends that Devereaux must have been aware of her prior lawsuit, she provides no evidence that this was so. *See* Pl.'s Resp. Opp. Mot. Summ. J. at 14.

Others apart from Devereaux were involved in some of the adverse actions at issue here, but the result is the same. For instance, there is no evidence that any of

the other individuals who were involved in Curtis's performance reviews and discipline were aware of her protected activity. *See* Def.'s SOF ¶ 26. Similarly, although Curtis contends that a different supervisor was responsible for promoting Devereaux over her and providing him with extra peer auditing experience, *see* Pl.'s SOAF ¶ 5, there is no evidence that the supervisor knew of her protected activity. And, as for the promotions she was denied, Curtis does not even explain who it was that was responsible for deciding not to hire her. Without some evidence that the relevant decisionmakers were aware of her protected activity, Curtis's retaliation claims fail. *See Cervantes v. Ardagh Grp.*, 914 F.3d 560, 566–67 (7th Cir. 2019); *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017).

Furthermore, Curtis has pointed to no evidence of retaliatory animus. As previously discussed, Curtis cannot show that any similarly situated employees were treated more favorably than she, or that she was meeting the City's legitimate employment expectations. Rather, the undisputed evidence shows that she performed poorly and was evaluated and disciplined accordingly. Although Curtis argues that the timing between her complaints and discipline was suspicious, "suspicious timing will rarely be sufficient in and of itself to create a triable issue." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) (internal quotation marks and citation omitted). This is especially true where, as here, there is no evidence that the "person who decided to impose the adverse action knew of the protected conduct." *Id.* (quoting *Lalvani v. Cook Cty., Ill.*, 269 F.3d 785, 790 (7th Cir. 2001)).

Because Curtis has pointed to no evidence of either causation or retaliatory animus, the City is entitled to summary judgment as to her claims of retaliation.[13]

## Conclusion

For the reasons stated herein, the City's motion for summary judgment is granted in its entirety.  Civil case terminated.

**IT IS SO ORDERED.**                    **ENTERED: 8/12/19**

_____
**John Z. Lee**
**United States District Judge**

---

[13] Because the Court concludes that Curtis's ADA claims fail on the merits, the Court does not address the City's argument that Curtis failed to exhaust her ADA claims. Similarly, because the City is entitled to summary judgment as to Counts I through V, the City is also entitled to summary judgment on Count VI, which seeks indemnification.